DCP:JPL
F. #2021R00965

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

LIONEL HANST,

                Defendant.

I N F O R M A T I O N

Cr. No. 22-75 (ENV)
(T. 18, U.S.C., §§ 982(a)(1), 982(b)(1), 1956(h) and 3551 et seq.; T. 21, U.S.C., § 853(p))

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE UNITED STATES CHARGES:

## INTRODUCTION

At all times relevant to this Information, unless otherwise indicated:

I.    The Defendant and Relevant Entities and Individuals

    A.    The Defendant and His Shell Companies

        1.    The defendant LIONEL HANST was a citizen of the Netherlands and resident of Curaçao.

        2.    Lion-Oil B.V. ("Lion Oil") was a shell company formed in or about November 2014 in Curaçao by the defendant LIONEL HANST. Lion Oil was principally used to receive, conceal and distribute corrupt payments from and on behalf of the U.S. energy trading company Vitol, Inc. for the benefit of Ecuadorian, Mexican and Venezuelan government officials.

        3.    Zanza Oil B.V. ("Zanza Oil") was a shell company formed in or about November 2014 in Curaçao by the defendant LIONEL HANST. Zanza Oil was principally used to receive, conceal and distribute corrupt payments from and on behalf of the U.S. energy trading

company Vitol, Inc. for the benefit of Ecuadorian, Mexican and Venezuelan government officials. Lion Oil and Zanza Oil maintained accounts at a bank in Curaçao ("Curaçao Bank"), an entity the identity of which is known to the United States.

B. State-Owned Oil and Gas Companies and Government Officials

4. Empresa Publica de Hidrocarburos del Ecuador ("Petroecuador") was the state-owned and state-controlled oil company of Ecuador. Petroecuador was wholly owned and controlled by the government of Ecuador and performed a function that Ecuador treated as its own. Petroecuador was an "instrumentality" of the Ecuadorian government and Petroecuador's officers and employees were "foreign officials," as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

5. Ecuadorian Official #1, an individual whose identity is known to the United States, was a citizen of Ecuador and a senior manager at Petroecuador in or about and between 2010 to May 2017. Ecuadorian Official #1 was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

6. Ecuadorian Official #2, an individual whose identity is known to the United States, was a citizen of Ecuador and held various positions in the Ecuadorian Ministry of Hydrocarbons in or about and between 2013 and 2016. Ecuadorian Official #2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

7. PEMEX Procurement International, Inc. ("PPI") was a wholly-owned and controlled subsidiary of Petróleos Mexicanos ("PEMEX"), the state-owned and state-controlled oil company of Mexico. PEMEX and PPI were owned and controlled by the government of Mexico and performed functions that Mexico treated as its own. PPI was based in Houston,

Texas, and provided procurement services to PEMEX and certain of its subsidiaries. PEMEX and PPI were "instrumentalities" of the Mexican government and PEMEX's and PPI's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

8. Mexican Official #1, an individual whose identity is known to the United States, was a citizen of Mexico and a resident of Houston, Texas. Mexican Official #1 worked at PPI in or about and between 1999 and 2020. In or about and between 2016 and 2020, Mexican Official #1 was a procurement manager at PPI. Mexican Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

9. Mexican Official #2, an individual whose identity is known to the United States, was a citizen of Mexico and a resident of Houston, Texas. Mexican Official #2 worked at PPI in or about and between 2006 and 2019. In or about and between 2017 and 2019, Mexican Official #2 was a procurement manager at PPI. Mexican Official #2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

10. Citgo Petroleum Corporation ("Citgo"), based in Houston, Texas, was a wholly-owned subsidiary of Petróleos de Venezuela, S.A. ("PDVSA"), the state-owned and state-controlled oil company of Venezuela, that acted primarily as a refiner, transporter and marketer of petroleum-based products, and also procured goods and services on behalf of PDVSA through its Special Projects group. Citgo was indirectly owned and controlled by, and performed functions of, the Venezuelan government, and was an "instrumentality" of the Venezuelan government, and Citgo's officers and employees were "foreign officials," as those

terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

11. Venezuelan Official #1, an individual whose identity is known to the United States, was a citizen of Venezuela. Venezuelan Official #1 was a senior executive at Citgo from in or about and between June 2013 and November 2017. Venezuelan Official #1's duties included overseeing all of Citgo's operations, including its Special Projects group. Venezuelan Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2) and 78dd-3(f)(2)(A).

C. Vitol and the Vitol Trader

12. Vitol, Inc. ("Vitol") was a United States company with its principal place of business in Houston, Texas. Vitol was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Vitol was beneficially owned by Vitol Holding BV, a company based in the Netherlands. These companies, together with their affiliates (the "Vitol Group"), formed one of the largest oil distributors and energy commodities traders in the world.

13. Vitol Trader, an individual whose identity is known to the United States, was a citizen of Mexico and a resident of Houston, Texas. Vitol Trader was an oil and commodities trader at Vitol. Vitol Trader was a "domestic concern" and an employee and agent of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

D. Intermediaries

14. Intermediary #1, an individual whose identity is known to the United States, was a citizen of Venezuela and Portugal and, as of 2016, a lawful permanent resident of

5

the United States. Intermediary #1 owned and controlled several shell companies and bank accounts that were used to facilitate the payment of bribes on behalf of Vitol to Venezuelan officials, including Venezuelan Official #1. Intermediary #1 was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

15. Intermediary #2, an individual whose identity is known to the United States, was a citizen of Ecuador, Spain and the United States who resided in the United States and acted as an agent for various energy trading companies, including Vitol. Along with Intermediary #3 (defined below), Intermediary #2 owned and controlled several shell companies and bank accounts in the United States and elsewhere that were used to facilitate the payment of bribes to Ecuadorian government officials. Intermediary #2 was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2.

16. Intermediary #3, an individual whose identity is known to the United States, was a citizen of Ecuador and Spain and Intermediary #2's relative, who acted as an agent for various energy trading companies, including Vitol. Along with Intermediary #2, Intermediary #3 owned and controlled several shell companies and bank accounts in the United States and elsewhere that were used to facilitate the payment of bribes to Ecuadorian officials. Intermediary #3 was an agent of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

17. Intermediary #4, an individual whose identity is known to the United States, was a citizen of Mexico. Intermediary #4 owned and controlled several shell companies and bank accounts that were used to facilitate the payment of bribes on behalf of Vitol to Mexican officials, including Mexican Official #1 and Mexican Official #2.

6

II.     The Foreign Corrupt Practices Act

        18.    The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

III.    The Bribery and Money Laundering Scheme

    A.    Overview

        19.    In or about and between November 2014 and September 2020, the defendant LIONEL HANST, together with others, engaged in an international money laundering scheme in which he and others knowingly and intentionally facilitated, concealed and disguised payments made by and on behalf of Vitol, knowing that the payments represented the proceeds of unlawful activity.

        20.    The payments were bribes and other fraudulent payments for Ecuadorian, Mexican and Venezuelan foreign officials, and others, by and on behalf of Vitol and Vitol Trader, in exchange for, among other things, securing improper advantages for Vitol in obtaining and retaining business with and related to various state-owned entities, including Petroecuador, PPI and Citgo.

        21.    To conceal and disguise the payments, the defendant LIONEL HANST utilized shell companies he controlled to wire and cause to be wired funds to shell companies controlled by Intermediary #1, Intermediary #2, Intermediary #3, Intermediary #4 and others, who then caused bribe and other fraudulent payments, including proceeds of the bribery scheme, to be sent to and for the benefit of various individuals, including Ecuadorian Official #1, Ecuadorian Official #2, Mexican Official #1, Mexican Official #2 and Venezuelan Official #1.

In furtherance of the conspiracy, wire transfers and electronic communications passed through the United States, including through the Eastern District of New York.

B. The Money Laundering Scheme

22. In or about late 2014, the defendant LIONEL HANST, while seeking employment as a regional broker for a Vitol Group affiliate, was introduced to Vitol Trader. Vitol Trader informed HANST that although he could not offer HANST a job as a broker, HANST could purportedly work from Curaçao overseeing other brokers in the region on behalf of Vitol and a Vitol Group affiliate. HANST and Vitol Trader agreed that HANST would be responsible for making payments, ostensibly to brokers in the region that he managed, on behalf of Vitol. In return, HANST would keep 5% of the money he received.

23. In or about November 2014, in preparation for making the payments on behalf of Vitol and a Vitol Group affiliate, the defendant LIONEL HANST formed Lion Oil and Zanza Oil. HANST subsequently opened bank accounts for Lion Oil and Zanza Oil at Curaçao Bank.

24. Since in or about late 2014 or early 2015, to further and conceal the scheme and the laundering of proceeds related thereto, Vitol Trader communicated with the defendant LIONEL HANST using the email address "perezmarcos007@gmail.com," instead of Vitol Trader's official Vitol email address. In or about February 2019, Vitol Trader began to communicate with HANST using a new non-Vitol email address, "sixtotomas007@gmail.com."

25. In order to conceal and disguise the payments Vitol made to him in furtherance of the bribery scheme, the defendant LIONEL HANST used Lion Oil to enter into a series of sham brokerage agreements and sham commodity swap agreements with a Vitol Group affiliate (together, the "Sham Vitol Agreements"). At Vitol Trader's direction, HANST signed

8

the Sham Vitol Agreements on behalf of Lion Oil, even though HANST knew that he would not perform any of the services described in the agreements. HANST then faxed the agreements to a Vitol Group affiliate at a Swiss fax number provided by Vitol Trader.

26. To further conceal and disguise his fraudulent transactions with Vitol, the defendant LIONEL HANST, at Vitol Trader's direction, prepared and submitted to a Vitol Group affiliate sham invoices (the "Hanst Invoices") on a periodic basis. Vitol Trader provided HANST with the information to include in the Hanst Invoices as purported justification for the payments, even though HANST, Lion Oil and Zanza Oil did not perform any work in connection with any such shipments.

27. In turn, to conceal and disguise the payments from Lion Oil and Zanza Oil to third parties, including Intermediary #1, Intermediary #2, Intermediary #3, Intermediary #4 and others, for the benefit of foreign officials from Ecuador, Mexico and Venezuela, the defendant LIONEL HANST agreed with Vitol Trader to draft and execute sham consulting service agreements between Lion Oil and Zanza Oil and the individuals and companies to be paid on behalf of Vitol (the "Sham Consulting Services Agreements"). HANST knew that the services detailed in the Sham Consulting Services Agreements would not be performed.

28. Vitol Trader subsequently provided bank routing instructions and sham invoices purportedly issued by the third parties (the "Sham Consulting Services Invoices") to the defendant LIONEL HANST, who then initiated wire transfers to those third parties. When providing the bank routing instructions and Sham Consulting Services Invoices, Vitol Trader typically copied an individual ("Co-Conspirator #1") who, like Vitol Trader, used an alias and non-business email address.

29. In order to further conceal and disguise the corrupt payments, the defendant LIONEL HANST provided to Curaçao Bank, among other things, the Sham Vitol Agreements, Sham Consulting Services Agreements and Sham Consulting Service Invoices.

30. In or about and between 2015 and 2020, pursuant to the Sham Vitol Agreements and Hanst Invoices, and at the direction and control of Vitol Trader and Co-Conspirator #1, a Vitol Group affiliate wired approximately $21 million from one or more bank accounts in the United Kingdom to the defendant LIONEL HANST in the Lion Oil and Zanza Oil bank accounts at Curaçao Bank, portions of which were transferred through the United States.

31. In or about and between 2015 and 2020, in furtherance of the scheme and at the instruction of Vitol Trader and Co-Conspirator #1, the defendant LIONEL HANST wired approximately $19.9 million to dozens of bank accounts in the United States, Mexico and elsewhere. Some of the bank accounts were held directly in the names of foreign officials, and others in the names of shell companies controlled by Intermediary #1, Intermediary #2, Intermediary #3, Intermediary #4 and others, who, in turn, used the corrupt funds for bribe and other fraudulent payments to and for the benefit of foreign officials and others, including Vitol Trader. For example:

(a) In or about 2015, Intermediary #1 wired a portion of the payments he received from the defendant LIONEL HANST to another intermediary for the benefit of Venezuelan Official #1, in exchange for Venezuelan Official #1's assistance to Vitol in obtaining and retaining business with Citgo;

(b) In or about and between 2017 and 2020, Intermediary #2 and Intermediary #3 transferred, directly and indirectly, a portion of the payments they received

through various shell companies from the defendant LIONEL HANST to Ecuadorian officials, including Ecuadorian Official #1 and Ecuadorian Official #2, in exchange for their assistance to Vitol in obtaining and retaining business in connection with a fuel oil contract related to Petroecuador; and

(c) In or about and between 2017 and 2020, Intermediary #4 transferred, directly and indirectly, a portion of the payments he received through various shell companies from the defendant LIONEL HANST to Mexican Official #1 and Mexican Official #2, in exchange for their assistance to Vitol in obtaining and retaining business with PPI.

CONSPIRACY TO COMMIT MONEY LAUNDERING

32. The allegations contained in paragraphs one through 31 are realleged and incorporated as if fully set forth in this paragraph.

33. In or about and between November 2014 and September 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LIONEL HANST, together with others, did knowingly and intentionally conspire to commit offenses under Title 18, United States Code, Section 1956, to wit: to transport, transmit and transfer monetary instruments and funds from one or more places in the United States to and through one or more places outside the United States, and to one or more places in the United States from and through one or more places outside the United States, knowing that such monetary instruments and funds involved in the transportation, transmissions and transfers represented the proceeds of some form of unlawful activity, and that such transportation, transmissions and transfers were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of one or more specified unlawful activities, to wit: (a) felony violations of the FCPA, in violation of Title 15,

United States Code, Sections 78dd-2 and 78dd-3; and (b) one or more offenses against a foreign nation, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv), involving bribery of a public official and the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of the Ecuadorian Penal Code, the Mexican Penal Code and the Venezuelan Penal Code, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION

34. The United States hereby gives notice to the defendant that, upon his conviction of the offense charged herein, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

35. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

   (a) cannot be located upon the exercise of due diligence;

   (b) has been transferred or sold to, or deposited with, a third party;

   (c) has been placed beyond the jurisdiction of the court;

   (d) has been substantially diminished in value; or

   (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p))

_____
BREON PEACE
United States Attorney
Eastern District of New York


_____
JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice


_____
DEBORAH L. CONNOR
Chief, Money Laundering and
  Asset Recovery Section
Criminal Division
U.S. Department of Justice

F.#: 2021R00965

FORM DBD-34
JUN. 85

No. 22-CR-75 (ENV)

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

LIONEL HANST,

Defendant.

# INFORMATION

(T. 18, U.S.C., §§ 982(a)(1), 982(b)(1), 1956(h) and 3551 et seq.;
T. 21, U.S.C., § 853(p))

*A true bill.*

_____
*Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* \_\_\_\_\_

_____
*Clerk*

*Bail, $* _____

*Jonathan P. Lax, Assistant U.S. Attorney (718) 254-6139*